IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DONALD CHARLES WILSON,                                   OPINION AND ORDER

        Plaintiff,                                                     14-cv-222-bbc

    v.

DR. PATRICK MURPHY,
DR. LORI ADAMS, and the WISCONSIN
DEPARTMENT OF CORRECTIONS,

       Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

       Plaintiff Donald Charles Wilson, an inmate at Oshkosh Correctional Institution in Oshkosh, Wisconsin, has filed this civil lawsuit against defendants Patrick Murphy, Lori Adams and the Wisconsin Department of Corrections.  Plaintiff contends that defendants Murphy and Adams violated his Eighth Amendment rights and engaged in medical negligence when defendant Murphy failed to effectively treat his neck condition and defendant Adams failed to treat his alleged mental health problems.  Plaintiff also contends that defendant Wisconsin Department of Corrections failed to accommodate his disabilities in violation of the Americans with Disabilities Act and the Rehabilitation Act.  The parties have filed cross-motions for summary judgment on all of plaintiff's claims, which are fully briefed and pending disposition.

       After reviewing the parties' submissions, I am granting defendants' motion for summary judgment and denying plaintiff's motion. First, with respect to plaintiff's Eighth

1

Amendment claim, plaintiff has failed to set forth sufficient evidence that defendant Murphy was deliberately indifferent to plaintiff's neck problems or that defendant Adams was deliberately indifferent to plaintiff's mental health condition.  Second, plaintiff's negligence claims against defendants Adams and Murphy fail because plaintiff has not presented any expert testimony that the conduct of either individual fell below the standard of care. Finally, plaintiff's claim under the ADA and Rehabilitation Act fails because there is insufficient evidence that his alleged disability prevented him from participating in prison programming.  Additionally, even if there were such evidence, plaintiff failed to exhaust his administrative remedies with respect to his contention that he was improperly denied access to the prison's substance abuse and domestic violence programs.

From the parties' summary judgment materials and the record, I find that the following facts are material and not subject to genuine dispute.

UNDISPUTED FACTS

The relevant facts in this case fall into three broad categories: (A) facts related to plaintiff's mental health; (B) facts related to plaintiff's physical health; and (C) facts related to plaintiff's ADA and Rehabilitation Act claim.

A. Plaintiff's Mental Health

On December 1, 2009, after violating his parole, plaintiff was re-incarcerated at Oshkosh Correctional Institution in Oshkosh, Wisconsin.  On his return to prison, plaintiff

2

was seen by defendant Adams, a psychologist supervisor at Oshkosh.  At the time of this initial evaluation, plaintiff's mental health records noted the following: "(1) cognitive disorder, not specified; (2) alcohol abuse; (3) rule/out dementia of the Alzheimer's type; and Axis III Alzheimer's disease."  After examining these records, Adams determined that plaintiff should be clinically monitored by the prison's psychological services unit.

On March 17, 2010, Adams met with plaintiff and referred plaintiff to a psychiatrist, Dr. Ashley Thompson, to evaluate plaintiff and determine whether plaintiff's depression could be treated with medication.  Thompson saw plaintiff twice in connection with this referral: once in March 2010 and once in August 2010.  Thompson's impression after meeting with plaintiff was that plaintiff did not suffer from either dementia or Alzheimer's disease.  She noted that plaintiff functioned well outside the health services examination environment, was able to manage the activities of daily living independently and exhibited "no evidence of any functional limitation whatsoever."  Thompson updated plaintiff's mental health records and revised plaintiff's diagnoses to reflect her belief that plaintiff was feigning symptoms of dementia and Alzheimer's disease.

On March 14, 2011, plaintiff met again with defendant Adams for a follow-up evaluation and interview.  Like Thompson, Adams also suspected plaintiff was malingering and did not suffer from either dementia or Alzheimer's.  She noted that although plaintiff presented himself to her and mental health professionals as unable to keep track of his thoughts, Oshkosh staff observing his daily activities saw no evidence of this type of mental difficulty.  For example, Oshkosh staff noted that on a number of occasions, plaintiff had

been seen playing chess with one of the high-functioning inmates in his unit. Nevertheless, defendant Adams consulted with the Wisconsin Resource Center (a specialized mental health facility for prisoners) and decided to refer plaintiff there so that he could be evaluated over the course of many months.

Plaintiff was transferred to the Resource Center on April 14, 2011. Upon arrival, he met with Dr. Thomas Michlowski, a psychiatrist, who ordered a CT scan. The CT scan came back negative, showing no evidence of dementia. Over the course of plaintiff's eight months at the Resource Center, he was observed by staff and met regularly with the Resource Center's mental health professionals. The observations of these individuals were consistent with the observations of staff members at Oshkosh: plaintiff showed no signs of Alzheimer's or dementia. Plaintiff was twice given the opportunity to participate in formal neuropsychological testing of his cognitive abilities, but both times he refused. In December 2011, plaintiff was sent back to Oshkosh. In the eight months he was at the Resource Center, staff did not uncover any evidence that plaintiff suffered from either dementia or Alzheimer's disease.

After returning to Oshkosh in December 2011, plaintiff complained to the health services unit and his primary care provider, defendant Murphy, about not receiving treatment for his mental health conditions. Murphy consulted with Dr. Jeffrey Fait, an Oshkosh psychiatrist, regarding plaintiff's mental health and whether Fait believed plaintiff was suffering from dementia and capable of making medical decisions. Fait raised the issue at a multi-disciplinary treatment team meeting the following week. At this meeting, the

prison's treatment team identified defendant Adams, Oshkosh's psychologist supervisor, as the person in the best position to assess plaintiff's mental condition. Adams said that there was no objective evidence of memory problems, cognitive deficits or confusion. Adams also indicated that plaintiff was sent to the Wisconsin Resource Center for neuropsychological testing, but twice refused to consent to such testing. Adams did not believe that referring plaintiff to psychiatry was necessary.

On May 24, 2013, plaintiff saw defendant Adams in response to a psychological services request. Plaintiff requested treatment for Alzheimer's disease. Adams explained that there was no documentation or objective evidence to support an Alzheimer's diagnosis.

### B. Plaintiff's Physical Health

In July 2011, while he was at the Wisconsin Resource Center, plaintiff began to experience problems with his neck and throat. On July 29, 2011, during an examination prompted by an unrelated medical problem (dizziness and excessive sweating), plaintiff's physician at the Resource Center, Dr. Carlo Gaanan, noticed that plaintiff's thyroid gland appeared to be swollen. Gaanan ordered an ultrasound of plaintiff's neck and blood tests to check plaintiff's thyroid hormone levels. When the blood test results indicated that plaintiff's thyroid hormone levels were low, Gaanan referred plaintiff to the endocrinology clinic at the University of Wisconsin Hospitals and Clinics.

After plaintiff returned to Oshkosh in December 2011, plaintiff's primary care provider at Oshkosh, defendant Murphy, continued to work with University of Wisconsin

endocrinologists to determine whether there was a problem with plaintiff's thyroid. Around this time, plaintiff began to complain to Oshkosh's health services unit that his neck was starting to hurt and that he was having trouble breathing. Plaintiff was given naproxen for his pain and the health services unit scheduled an appointment with defendant Murphy.

On February 10, 2012, plaintiff went to the health services unit with complaints that he was having difficulty breathing and swallowing. The nurse examining plaintiff sent him to see defendant Murphy immediately. After examining plaintiff, Murphy ordered another CT scan, which he scheduled for March 8, 2012. However, when plaintiff boarded the bus on March 8, 2012 to be transported to the University of Wisconsin Hospital, he claimed that he could not remember his department identification number or his birth date. Plaintiff was brought to the health services unit and indicated that he did not feel well. Murphy canceled the appointment he had scheduled because of the apparent acute change in plaintiff's condition, rescheduled plaintiff's CT scan for June 2012 and ordered additional blood tests, which were sent to the University of Wisconsin Hospital's endocrinology clinic.

In March 2012, Dr. Dawn Davis, an endocrinologist at the University of Wisconsin Hospital, reviewed plaintiff's blood tests, the CT scans that had previously been performed and plaintiff's medical history. Davis noted that plaintiff's thyroid hormone levels were normal. Subsequently, the June 2012 CT scan confirmed that the neck and throat problems plaintiff was experiencing were not attributable to a thyroid condition. However, the scan did show evidence of inflammation and raised a concern that plaintiff had laryngeal cancer or a hypopharyngeal lesion. Murphy discussed these results with plaintiff on July 9, 2012

and prescribed plaintiff a soft diet because of the difficulty he was having in swallowing. Murphy also scheduled an appointment with Dr. Timothy M. McCulloch, an otolaryngologist in the Department of Surgery at the University of Wisconsin.

Plaintiff saw Dr. McCulloch on August 8, 2012 and underwent a flexible endoscopy. McCulloch saw nodules in plaintiff's throat, an asymmetry in his right hypopharynx, degeneration in his spine and hardware in his neck from spinal fusion surgery. McCulloch recommended that plaintiff receive a month of antibiotic therapy and a direct laryngoscopy. McCulloch also thought that a biopsy might have to be performed. Murphy prescribed the recommended antibiotic and made the recommended follow-up appointment. Murphy also continued to provide plaintiff naproxen for his pain.

Plaintiff returned to the University of Wisconsin Hospital's Otolaryngology Clinic for a follow-up appointment on September 13, 2012. McCulloch performed another endoscopy and noted that plaintiff continued to have swelling on the right side of his hypopharynx, but McCulloch did not see any tissue masses or abnormalities. Moreover, McCulloch noted that it appeared that the swelling in plaintiff's throat responded well to the prescribed antibiotics and that a biopsy was no longer necessary. McCulloch believed that the spinal fusion hardware might be the source of plaintiff's neck problems. Accordingly, he recommended that plaintiff be evaluated by an orthopaedic surgeon to determine whether the spinal hardware could be surgically removed. McCulloch also recommended that plaintiff consult one of the hospital's speech pathologists regarding "conservative measures" that might improve plaintiff's ability to swallow. Murphy agreed with McCulloch's

assessment and made the recommended appointments.

On March 29, 2013, plaintiff met with Jodi Hernandez, a University of Wisconsin Hospitals speech pathologist, for a swallow evaluation. Hernandez performed an outpatient videofluoroscopic swallow study and recommended that plaintiff's soft diet be extended indefinitely. Murphy accepted Hernandez's recommendations. Murphy also changed plaintiff's pain reliever from naproxen to a daily regime of extra-strength acetaminophen for one year.

On April 19, 2013, plaintiff was examined by Dr. Amgad S. Hanna, a doctor in the University of Wisconsin Department of Neurological Surgery, to determine whether his spinal fusion hardware could be removed. After examining plaintiff, reviewing his neck CT, neck CT with PET, chest CT scans and his March 2013 swallow study, Hanna concluded that "any type of surgical intervention to try to remove [the spinal fusion hardware] will be extremely problematic and wrought with a high chance of morbidity with esophageal injury and injury to major vessels." McCulloch later consulted with plaintiff regarding Hanna's recommendation and told plaintiff that removing the spinal fusion hardware was not prudent. Plaintiff disagreed with Hanna and McCulloch and said he wanted the spinal fusion hardware removed.

Throughout the spring of 2013, plaintiff continued to complain about his throat pain. In mid-April he went to the health services unit complaining of severe pain. Murphy's examination of plaintiff led him to suspect that plaintiff's neck pain was at least partially attributable to dental problems that plaintiff had first complained about on January 6, 2013.

8

Although plaintiff had a dental appointment scheduled for the next day, when it came time to remove plaintiff's problematic teeth, the dentist determined that plaintiff's blood pressure was too high to proceed.  To help with the pain, plaintiff's dentist gave him narcotic painkillers.  When Murphy saw plaintiff in April, Murphy attempted to reschedule plaintiff's dental appointment to have the decaying teeth extracted, but plaintiff refused to consent to the procedure then and on a number of other occasions.  (The parties disagree about why plaintiff refused to consent to the procedure: plaintiff asserts, in an entirely conclusory manner, that he refused to consent "due to pain and . . . his ongoing health issues.").

Plaintiff continued to complain about his throat pain and he suffered from additional complications.  On May 2, 2013, an incident occurred in the V-Unit dayroom at Oshkosh, in which plaintiff nearly collapsed.  Oshkosh staff rushed him to Mercy Medical Center by ambulance.  While at Mercy, x-rays were performed and plaintiff received intravenous drugs. The treatment notes from Mercy Medical Center indicate that the doctors believed plaintiff's hardware was the source of plaintiff's problems.  After returning to Oshkosh, Murphy prescribed plaintiff an antibiotic and another course of narcotic painkillers.  Plaintiff was also given a doctor's order that allowed him to use a wheelchair, an order that provided someone to push him around in his wheelchair and a medication order for six months of Ensure (a nutritional supplement) to address his weight loss.

On October 23, 2013, plaintiff finally consented to have two of his teeth extracted. Soon thereafter, on November 13, plaintiff had a follow-up appointment with McCulloch. At this appointment, McCulloch noted that the swelling in plaintiff's neck had resolved

completely.  However, McCulloch also noted that plaintiff remained "fixated" on his belief that the spinal fusion hardware needed to be removed.  Again, McCulloch consulted with the hospital's neuro spine team, who "felt that there was no indication for hardware removal and felt that possible hardware removal would be fraught with disaster."  McCulloch spent a significant amount of time trying to reassure plaintiff that the hardware was not the problem and that no one at the University of Wisconsin Hospitals and Clinics was willing to operate on him to remove the hardware.

Plaintiff had a six month follow-up appointment with the University of Wisconsin Hospitals on July 7, 2014 and again on January 12, 2015.  At the January appointment, the hospital's specialists suggested that plaintiff receive a bronchoscopy, an airway exam, lab tests, a transthoracic echocardiogram and another CT scan of his chest.  All of these procedures were scheduled and performed.  Plaintiff's brochoscopy showed that he had chronic obstructive pulmonary disease (COPD), which the specialists concluded was the cause of his breathing difficulties.

Although plaintiff had already been examined by a number of doctors and specialists at the University of Wisconsin Hospitals, all of whom advised against removing the spinal hardware, plaintiff wished to consult with his own doctor regarding the issues related to his neck and to discuss whether his spinal fusion hardware could be surgically removed. Although defendants initially refused to transport plaintiff to another specialist, on June 2, 2015, I entered an order directing defendants to transport plaintiff to a doctor of his choice for an evaluation.  On August 5, 2015 plaintiff was transported to Dr. Kalmjit Paul, a

neurosurgeon, for an initial evaluation.  After this initial evaluation, Dr. Paul requested that Murphy schedule plaintiff for a series of spinal x-rays, MRI scans and EMG studies.  Dr. Paul indicated that these tests were necessary for him to properly evaluate plaintiff.  Murphy ordered all of the requested tests, sent the results to Paul and scheduled plaintiff for a follow-up examination with Paul.

On September 22, 2015, after all of the requested tests were performed, plaintiff was again transported to Paul's office for an examination.  At that appointment, Paul reviewed the test results with plaintiff and informed plaintiff that he agreed with the University of Wisconsin Hospital's assessment that additional surgery was not indicated and would not improve his condition.  He noted that performing surgery would require more spinal fusion hardware and would lead to "adjacent level disease."  Instead of surgery, Paul recommended "conservative treatment."  After plaintiff's counsel asked what Paul meant by "conservative treatment," Paul wrote a follow-up letter to counsel explaining that:

> Conservative treatment . . . varies from patient to patient and is determined by the benefit that the individual patient receives from the conservative treatment. Types of conservative treatment include, but are not limited to, physical therapy, a chronic pain management program (ie: pain medications, epidural steroid  injections, facet joint injections, possible nerve ablation, acupuncture, massage, etc.), chiropractic treatment, pool therapy. The various conservative treatment modalities would need to be tried by [plaintiff] to determine their benefit to him.

Paul did not recommend any specific type of "conservative" treatment modality or suggest that the modalities he mentioned were particularly appropriate in plaintiff's case.

C. Plaintiff's Disabilities and Attempts to Enroll in Prison Programming

In January 2012, plaintiff went to Oshkosh's health services unit with complaints that he felt dizzy and weak.  At the time, plaintiff attributed these problems to his apparent thyroid problems.  To address these problems, plaintiff requested a low bunk and someone to push him in his wheelchair.  The nurse he met with temporarily authorized these requests until his next appointment with defendant Murphy in March 2012.  At the March appointment, Murphy refused to renew these accommodations because plaintiff had been seen on a number of occasions walking around the recreation yard without assistance or difficulty.  Murphy believed there was nothing to suggest that plaintiff was suffering from a severe impairment that justified these accommodations.   The authorization for a wheelchair pusher was eventually renewed in May 2013 after the incident in which plaintiff fell down in the V-Unit dayroom.  Although plaintiff's low bunk prescription was never renewed, he was not forced to sleep in a higher bunk; he has always had a lower bunk.

In May 2013, plaintiff was given a prescription for six months of Ensure to help him gain weight.  Murphy refused to renew this prescription in January 2014 because plaintiff's body mass index was 20, which was normal.  Accordingly, Murphy believed that prescription nutritional supplements, such as Ensure, were no longer medically indicated.

 Oshkosh runs programs that are aimed at rehabilitating prisoners convicted of domestic violence or that have substance abuse issues.  Prisoners that participate in these programs and complete them successfully are more likely to be granted parole.  Prisoners are selected to participate on a case-by-case basis.  Plaintiff attempted to enroll in the substance

abuse program in October 2013 and the domestic violence program in March 2014, but was placed on a waiting list for both programs.


OPINION

Plaintiff's claims fall into three broad categories: (A) claims under the Americans with Disabilities Act and the Rehabilitation Act; (B) claims under 42 U.S.C. § 1983; and (C) state law negligence claims.  I will take up each category in turn.


A. The Americans with Disabilities Act and the Rehabilitation Act

To show a violation of either the ADA or the Rehabilitation Act in the prison context plaintiff must prove (1) that he is a "qualified individual with a disability"; (2) that he was denied "the benefits of the [prison's] services, programs, or activities" or otherwise subjected to discrimination; and (3) that the denial or discrimination was "by reason of" plaintiff's disability.  Love v. Westville Correctional Center, 103 F.3d 558, 561 (7th Cir. 1996). Plaintiff says his rights under the ADA and the Rehabilitation Act were violated when he was (1) denied access to certain domestic violence and substance abuse programs and (2) denied access to dental treatment. These claims fail for a variety of reasons.

First, plaintiff has not set forth any evidence that he "meets the essential eligibility requirements" for the domestic violence programming.  42 U.S.C. § 12131(2) ("The term 'qualified individual with a disability' means an individual who . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or

13

activities provided by a public entity."). Plaintiff does not respond to defendant's argument that plaintiff is precluded from participating in the domestic violence program while he is appealing his domestic violence conviction.

Second, plaintiff fails to adduce sufficient evidence that he was denied access to either the domestic violence program or the substance abuse program because of his disability. Plaintiff's unsubstantiated and self-serving statement that he was denied access because of his health problems does not create a genuine dispute of material fact so as to defeat defendant's motion for summary judgment. Weigel v. Target Stores, 122 F.3d 461, 469 (7th Cir. 1997); Koelsch v. Beltone Electronics Corp., 46 F.3d 705, 708 (7th Cir. 1995). Plaintiff has failed to draw a plausible connection between his alleged disabilities and the fact that he was placed on the waiting list for the domestic violence and substance abuse programs.

Third, it is undisputed that plaintiff failed to exhaust his ADA and Rehabilitation Act claims related to the domestic violence and substance abuse programs. The Prison Litigation Reform Act provides expressly that "[n]o action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Plaintiff's attempt to avoid the PLRA's exhaustion requirement on the ground that the relevant administrative procedure applies only to "significant issues" affecting prison life is entirely without merit. Wis. Admin. Code DOC § 310.08(1) ("An inmate may use the ICRS to raise *significant issues* regarding rules, living

14

conditions, staff actions affecting institution environment, and civil rights complaints in accordance with this chapter.") (emphasis added).  Although I have been unable to identify any authority regarding what constitutes a "significant issue" for purposes of § 310.08(1), any reasonable interpretation would necessarily be broad enough to encompass alleged violations of federal laws, particularly when those violations are significant enough to lead to litigation in federal court.  Indeed, one of the express purposes of Wisconsin's Inmate Complaint Review System was to provide the Department of Corrections an opportunity to resolve problems "before an inmate commences a civil action or special proceeding" against prison officials.  Wis. Admin. Code DOC § 310.01(2)(b).

Finally, plaintiff contends that defendants violated the ADA by denying him access to dental treatment. This claim also fails.  It is undisputed that plaintiff was scheduled to receive dental treatment on January 7, 2013, but that plaintiff's dentist determined that it would be unsafe to go forward because plaintiff's blood pressure was too high.  Thus, the delay in receiving treatment was not attributable to a disability; it was attributable to a medical determination that the scheduled procedure was imprudent.  A public entity does not violate the ADA or the Rehabilitation Act by refusing to provide treatment that it believes is dangerous in light of the plaintiff's medical conditions.   Burger v. Bloomberg, 418 F.3d 882, 883 (8th Cir. 2005) ("[A] lawsuit under the Rehab Act or the Americans with Disabilities Act (ADA) cannot be based on medical treatment decisions."); Fitzgerald v. Corrections Corp. of America, 403 F.3d 1134, 1144 (10th Cir. 2005) ("[Doctor's refusal to perform surgery is] the sort of purely medical decision[] that we have held do[es] not

15

ordinarily fall within the scope of the ADA or the Rehabilitation Act.").

### B. Section 1983

Plaintiff's § 1983 claim is premised on his contention that defendant Murphy and defendant Adams were deliberately indifferent to plaintiff's neck pain and mental health problems, respectively, in violation of his Eighth Amendment rights. To obtain relief on such a claim, plaintiff must make both an objective showing and a subjective showing. First, with respect to the objective showing, plaintiff must prove that he suffers from a serious medical condition. Dunigan v. Winnebago, 165 F.3d 587, 590 (7th Cir. 1999). Second, with respect to the subjective element, the plaintiff must demonstrate that a state official acted with "deliberate indifference" to the plaintiff's medical needs. Id. Prison officials exhibit "deliberate indifference" when they know of and disregard an excessive risk to inmate health and safety. Farmer v. Brennan, 511 U.S. 825, 837 (1994). The prisoner must show that the defendant "literally ignored" the plaintiff's problems or provided care that was "so blatantly inappropriate as to evidence intentional mistreatment." Snipes v. DeTella, 95 F.3d 586, 592 (7th Cir. 1996) (internal quotations omitted).

I will assume for purposes of the parties' motions for summary judgment that plaintiff's neck problems and subjective mental health complaints both qualify as objectively serious medical conditions. However, I conclude that defendants Murphy and Adams are each entitled to summary judgment because neither acted with deliberate indifference to these conditions.

16

1. <u>Dr. Murphy</u>

No reasonable jury could conclude that defendant Murphy exhibited deliberate indifference to plaintiff's medical conditions. Over the past five years, Murphy has attempted to identify the underlying cause of plaintiff's neck problems so that appropriate treatment could be identified. Murphy sent plaintiff to an endocrinologist, an otolaryngologist, an orthopaedic surgeon, speech therapists and a neurosurgeon. These specialists performed countless tests and ruled out a variety of potential conditions ranging from hyperthyroidism to cancer. Neither Murphy nor any of the doctors to whom he referred plaintiff has been successful in identifying the cause of and treating plaintiff's problems, but their inability to do so is not for lack of trying.

In addition to attempting to ascertain what is causing plaintiff's neck and throat problems, defendant Murphy has also taken a number of steps to treat and alleviate plaintiff's symptoms. Murphy has prescribed plaintiff a variety of different pain killers in a number of different doses, including narcotic pain killers when plaintiff's pain was particularly acute. Plaintiff has also received "swallow therapy" from a speech therapist, a special diet to make eating easier and nutritional supplements to help him gain weight when necessary. Plaintiff was also prescribed antibiotics on a number of occasions to treat apparent infections that were either associated with or causing his neck problems.

Although plaintiff takes issue with certain setbacks or delays he attributes to Murphy, none of these complaints are sufficient, either by themselves or in the aggregate, to create a genuine issue of material fact with respect to whether Murphy exhibited "deliberate

indifference" to plaintiff's neck problems.  First, plaintiff contends that Murphy exhibited deliberate indifference by denying plaintiff's requests for an assessment and examination by a neurosurgeon of plaintiff's choosing.   However, it is well-established that the Eighth Amendment does not provide prisoners the right to see a specific doctor or obtain a specific type of treatment; all they are entitled to is reasonable care free from blatantly inappropriate medical decisions.  Forbes v. Edgar, 112 F.3d 262, 267 (7th Cir. 1997) ("Under the Eighth Amendment, [an inmate] is not entitled to demand specific care. She is not entitled to the best care possible. She is entitled to reasonable measures to meet a substantial risk of harm to her.").   No reasonable jury could conclude that Murphy's refusal to send plaintiff to a particular neurosurgeon qualifies as deliberate indifference, particularly in light of the fact that plaintiff had already been examined by Dr. Hanna, a neurosurgeon at the University of Wisconsin Hospitals.

Next plaintiff contends that Murphy failed to provide him "conservative treatment," as recommended by Paul.  However, this argument is beset by a number of problems. First it is unclear whether Murphy actually failed to provide plaintiff "conservative treatment." Paul did not specify what he meant by conservative treatment; he simply identified an array of treatment possibilities, including painkillers, massage, acupuncture and pool therapy. Although it is unclear, it appears that Paul's letter regarding conservative treatment was explanatory, not prescriptive. Paul was not recommending pool therapy, acupuncture or massage in this particular case; instead, he was recommending and describing a general approach to treatment. It is undisputed that Murphy's approach to treating plaintiff has

18

involved the use of painkillers, which is one of the conservative treatment modalities identified by Paul.

Moreover, even if one were to conclude that Murphy has failed to provide plaintiff they type of "conservative treatment" contemplated by Paul (for example, by failing to provide "pool therapy"), such a conclusion is relevant only if plaintiff can establish that Murphy's failure to do so was "blatantly inappropriate." Berry v. Peterman, 604 F.3d 435, 441 (7th Cir. 2010). Plaintiff has failed to set forth any evidence that failing to provide the conservative treatment contemplated by Paul is blatantly inappropriate. At the most, Paul's letters and recommendations establish a difference of opinion as to how plaintiff should be treated, which is insufficient to state an Eighth Amendment claim. Estate of Cole by Pardue v. Fromm, 94 F.3d 254, 261 (7th Cir. 1996) ("Mere difference of opinion among medical personnel regarding a patient's appropriate treatment do not give rise to deliberate indifference."). In other words, even if I were to conclude that Murphy did not provide the type of treatment Paul recommended, plaintiff's claim would still fail because he has not presented evidence that failing to provide that type of treatment was "blatantly inappropriate."

Finally, plaintiff's complaint that on one occasion in 2014 he was forced to wait a number of months before he could see Murphy is insufficient to establish that Murphy was deliberately indifferent. It is undisputed that after one of plaintiff's numerous encounters with the health services unit, plaintiff was referred to see Murphy but could not get an appointment for more than two months. However, this claim fails for at least two reasons.

19

First, as the Court of Appeals for the Seventh Circuit has explained, "in cases where prison officials delayed rather than denied medical assistance to an inmate," the plaintiff must "offer verifying medical evidence that the delay (rather than the inmate's underlying condition) caused some degree of harm." Conley v. Birch, 796 F.3d 742, 749 (7th Cir. 2015) (citing Jackson v. Pollion, 733 F.3d 786, 790 (7th Cir. 2013)).  Plaintiff has offered no evidence that the delay caused him any harm or pain beyond what he had been experiencing since 2011.

Second, even if plaintiff were harmed by the delay, an isolated incident that occurred once in a five-year span does not rise to the level of deliberate indifference. Walker v. Peters, 233 F.3d 494, 501 (7th Cir. 2000) ("We examine the totality of an inmate's medical care when determining whether prison officials have been deliberately indifferent to an inmate's serious medical needs. Viewing the totality of the care Walker received for his hemophilia, isolated incidents of delay . . . cannot be construed to be deliberate indifference.") (internal citation omitted); Gutierrez v. Peters, 111 F.3d 1364, 1374-75 (7th Cir. 1997). Given the number of times Murphy examined plaintiff, a delay on one occasion is not enough to demonstrate that Murphy was deliberately indifferent to plaintiff's plight.


2. Dr. Adams

Plaintiff also contends that defendant Adams was deliberately indifferent in failing to treat his Alzheimer's disease and dementia. This claim fails for the simple reason that plaintiff has failed to show that he suffered from either condition.  A defendant cannot be

found liable for failing to treat a disease that a plaintiff does not have.  Guzman v. Sheahan, 495 F.3d 852, 858 (7th Cir. 2007) ("[D]eliberate indifference requires that the corrections office must have '*actual* knowledge' of the risk.") (citation omitted).  The only evidence plaintiff has identified in support of his claim that he has Alzheimer's or dementia are his subjective complaints and a vague diagnosis in his medical file, which says "R/O 290 Dementia of the Alzheimer's Type." (Although defendants do not raise the issue, R/O is presumably an abbreviation for "rule out," which would suggest that the doctors were not sure that plaintiff had Alzheimer's). In fact, defendant Adams took plaintiff's subjective complaints and his purported diagnosis seriously and sent plaintiff to the Wisconsin Resource Center for an evaluation.  Plaintiff refused testing at the Resource Center and the mental health staff there failed to identify any evidence of actual dementia or Alzheimer's. Defendant Adams relied on the opinion of the professionals at the Resource Center, as well as the opinion of plaintiff's psychiatrists at Oshkosh, in concluding that plaintiff did not have mental health problems requiring treatment.

A doctor does not exhibit deliberate indifference by failing to treat a condition that he genuinely believes does not exist.  Hughes v. Joliet Correctional Center, 931 F.2d 425, 428-29 (7th Cir. 1991) ("If the defendants honestly thought that Hughes had no spinal injury and was capable of walking without crutches, then their behavior, while crass and unprofessional, would not amount to deliberate or even reckless infliction of punishment and so would not be actionable under the Constitution.").

C. <u>Negligence</u>

In addition to asserting a violation of his constitutional rights, plaintiff contends that the medical care defendants Murphy and Adams provided was negligent under Wisconsin state law.  Ordinarily, a federal district court will relinquish jurisdiction over any remaining supplemental state law claims when it dismisses all of the federal claims over which it has original jurisdiction before trial.  <u>Doe-2 v. McLean County Unit Dist. No. 5 Board of Directors</u>, 593 F.3d 507 (7th Cir. 2010).  However, "the values of judicial economy, convenience, fairness and comity" weigh in favor of retaining jurisdiction in this case despite the fact that I am dismissing plaintiff's federal claims.  <u>Hansen v. Board of Trustees of Hamilston Southeastern School Corp.</u>, 551 F.3d 599, 608 (7th Cir. 2008).  In particular, plaintiff's negligence claims are very closely "intertwined" with his § 1983 claims and "judicial economy is served by treating them in one forum."  <u>Id.</u>  Moreover, plaintiff's negligence claims do not raise difficult issues of state law that might militate in favor of dismissal.  <u>Id.</u>  ("Furthermore, the correct disposition of the state claims against [defendant] is clear and does not entangle the federal courts in difficult issues of state law.").

"Under Wisconsin law, medical malpractice has the same ingredients as garden-variety negligence claims: the plaintiff must prove that there was a breach of a duty owed that results in an injury." <u>Gil v. Reed</u>, 535 F.3d 551, 557 (7th Cir. 2008) (citing <u>Paul v. Skemp</u>, 242 Wis. 2d 507, 625 N.W.2d 860, 865 (2001)).  Establishing medical negligence requires the plaintiff to present expert testimony unless the alleged negligence was "of such a nature that a layperson could conclude from common experience that such mistakes do not

22

happen if the physician had exercised proper skill and care." <u>Gil v. Reed</u>, 381 F.3d 659 (7th Cir. 2004) (citing <u>Christianson v. Downs</u>, 90 Wis. 2d 332, 279 N.W.2d 918, 921 (1979)). Plaintiff has failed to present any expert testimony that either defendant Murphy or defendant Adams breached the standard of care.  The only evidence plaintiff points to are Paul's treatment notes and the letter Paul wrote to plaintiff's counsel describing "conservative treatment." Even if these materials qualified as expert testimony from an evidentiary standpoint, they fail to create a genuine issue of material fact.  Nothing in them suggests that Paul had found fault with Murphy's course of treatment up until that point. Paul's recommendations can be construed only as setting forth potential treatment modalities going forward.  Accordingly, defendants' motion for summary judgment on plaintiff's state law negligence claim will be granted.

## ORDER

IT IS ORDERED that

1. The motion for summary judgment, dkt. #63, filed by plaintiff Donald Charles Wilson is DENIED and the motion for summary judgments, dkt. #54, filed by defendants Dr. Patrick Murphy, Dr. Lori Adams and the Wisconsin Department of Corrections is GRANTED.

2. The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered this 29th day of March, 2016.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge